

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
01/16/2009

| | | |
|---|---|---|
| IN RE: | § | Case No. 08-33160 |
| AMERICAN COASTAL ENERGY INC, | § | Chapter 11 |
| Debtor(s). | § | Judge Isgur |

## <u>MEMORANDUM OPINION</u>

### Summary

Immediately after American Coastal Energy Inc. ("American Coastal") filed a chapter 11 bankruptcy petition, the Texas Railroad Commission (the "Commission") spent state funds to remediate environmental risks for which American Coastal had ongoing responsibility.  The Commission contends that these post-petition expenditures are entitled to administrative expense priority under § 503(b)(1)(A).  American Coastal contends that the expenditures were for a pre-petition liability and that only liabilities that arise after the petition date can qualify as a § 503(b)(1)(A) administrative expense.

The Court holds that the Commission's claim for recovery of its post-petition expenditures is an administrative expense under § 503(b)(1)(A).  Debtors-in-possession must manage the bankruptcy estate in compliance with state and federal environmental and safety laws.  The fact that American Coastal's pre-petition activities led to the necessity of the post-petition remediation does not alter American Coastal's continuing post-petition obligation to conform with the law.  Consequently, the costs to bring the estate into compliance with such laws are costs that are actual and necessary to preserve the estate, entitled to administrative expense characterization under § 503(b)(1)(A).

### Facts

American Coastal is an oil and gas exploration company that owned and operated oil and

gas wells.  Prior to American Coastal's bankruptcy filing, eight wells became inactive for over a year.  Under the Texas Administrative Code, a well operator must plug a well that has been inactive for a year or longer. 16 TEX. ADMIN. CODE § 3.14(b)(2) ("Plugging operations on each dry or inactive well shall be commenced within a period of one year after drilling or operations cease and shall proceed with due diligence until completed."); TEX. NAT. RES. CODE ANN. § 89.011(a); *Lawyers Sur. Corp. v. State*, 753 S.W.2d 703, 704 (Tex. App.—Austin, no pet. 1988). Failure to plug an inactive well may result in fines of up to $10,000 per day. TEX. NAT. RES. CODE ANN. § 85.381. American Coastal failed to timely plug the wells.  In 2006, the Commission notified American Coastal that the eight inactive wells were in violation of the Natural Resources Code.  In July of 2007, the Commission issued "plug and abandon"[1] orders on the eight wells.  In January of 2008, the Commission issued Final Orders requiring American Coastal to plug the wells.  The parties agree that American Coastal had a pre-petition obligation to plug the wells.

On May 15, 2008, American Coastal filed a chapter 11 bankruptcy petition.  On May 18, 2008, the Commission plugged one of the eight wells.  On May 19, 2008, American Coastal and the Commission entered into a settlement.  Under the settlement, the Commission agreed to postpone plugging four of the wells.  The remaining three wells were subsequently plugged.  The Commission's costs for plugging four wells was $496,952.35.  American Coastal paid the Commission $75,000.00 under the settlement, leaving a balance due of $421,952.35.  The parties do not dispute the balance amount.

American  Coastal's  chapter  11  plan  listed  the  $421,952.35  balance  as  a  general

---

[1] The Court understands that a "plug and abandon" order requires the operator of a well to permanently close the well so that the well will not pose a future environmental hazard.  In this case, there is no allegation that the wells were currently leaking or causing other current environmental problems.  The allegation is that the wells posed the risk of a future environmental problem.

unsecured claim. The Commission objected, alleging that its claim deserved priority status under § 503(b)(1)(A).  The Court ordered briefing on the proper characterization of the Commission's claim.  On November 20, 2008, the parties presented their arguments and evidence before the Court.[2]

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## Section 503(b)(1)(A)

Section 503(b) of the Bankruptcy Code defines which claims against the debtor are characterized as administrative expenses. 11 U.S.C. § 503(b). Under § 507(a), administrative expenses are given priority over all other unsecured claims, other than domestic support obligations and certain trustee expenses not relevant in this case. 11 U.S.C. § 507(a).   In a chapter 11 case, the debtor generally must pay administrative expenses in full on the effective date of the plan (except to the extent that the holder has agreed to different treatment). 11 U.S.C. § 1129(a)(9)(A).

Section 503(b)(1)(A) defines an administrative expense to include "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). The Fifth Circuit has held that a § 503(b)(1)(A) expense "must have been of benefit to the estate and its creditors." *Tex. v. Lowe (In re H.L.S. Energy Co., Inc.)*, 151 F.3d 434, 437 (5th Cir. 1998). The benefit

---

[2] After oral arguments on the § 503(b) issue, American Coastal filed a Fourth Modified Chapter 11 Plan.  The Fourth Modified Plan provided that the Commission's claim would be treated as a priority administrative expense or a general unsecured claim, depending on this Court's determination of whether the Commission's claim qualified as a § 503(b) administrative expense.  The plan provided for payment of the Commission's claim in full on the effective date of the plan if the Court found the claim to be an administrative expense.  The plan provided for payment of the Commission's claim in full over seven years, with interest, if the Court found the claim to be a general unsecured claim.  On December 5, 2008, the Court confirmed the Fourth Modified Plan.

requirement is not an additional element to a § 503(b)(1)(A) claim, but rather a means for testing whether an expense is truly "necessary." *Id.* ("The 'benefit requirement has no independent basis in the Code, however, but is merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no 'benefit,' it cannot have been 'necessary.'") (citing LAWRENCE P. KING ED., 4 COLLIER ON BANKRUPTCY ¶ 503.06[3][b] (15th rev. ed. 1998)).

The Fifth Circuit has held that post-petition plugging and abandonment obligations are generally entitled to administrative priority. *In re H.L.S. Energy*, 151 F.3d 434. However, the Fifth Circuit has also held that § 503(b)(1)(A) pertains only to post-petition claims. *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 387 (5th Cir. 2001) ("In order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefited the estate").

In order to reconcile these two positions, the Court must analyze whether an environmental claim "arises post-petition" even when its genesis is in the debtor's pre-petition conduct.[3] The award in *Jack/Wade Drilling* was the liquidation of an amount due pre-petition. *In re Jack/Wade Drilling*, 258 F.3d 385. The *Jack/Wade* opinion, therefore, considered facts far removed from the concept at issue in this case—an ongoing environmental hazard that the debtor has a continuing duty to remediate.

## Analysis

The Fifth Circuit has held that an expense incurred post-petition to remedy a post-petition environmental liability is an administrative expense under § 503(b)(1)(A). *In re H.L.S. Energy*, 151 F.3d 434. *H.L.S. Energy* also involved an oil and gas company. *Id.* at 436. H.L.S. Energy,

---

[3] The Court notes that its analysis is limited to environmental remediation claims made by a governmental unit for post-petition remediation.

like American Coastal, had oil and gas wells that were inactive for more than one year and thus subject to the Texas Administrative and Natural Resources Codes' plugging requirement. *Id*. Post-petition, the Commission incurred plugging expenses. *Id*. However, the one-year period of inactivity did not conclude until after H.L.S. Energy filed a bankruptcy petition. Accordingly, although H.L.S. Energy's plugging liability was attributable to H.L.S. Energy's pre-petition conduct, the timing of the obligation meant that the first day on which Texas could enforce the obligation arose during the pendency of the case.

The Fifth Circuit held that the plugging expense was an actual and necessary cost of the estate. *Id.* at 438. The Fifth Circuit reasoned that debtors must operate a bankruptcy estate in accordance with state law. *Id*. Additionally, the Court noted that continued non-compliance with the plugging requirement subjected the estate to daily fines. *Id*. Accordingly, expenses incurred to bring a debtor in compliance with state law were actual and necessary costs. *Id.*

The Fifth Circuit has not considered whether a well-plugging expense incurred by a state agency post-petition to remedy a pre-petition environmental obligation is also an actual and necessary expense that benefits the estate. *TNF Fin., Inc. v. Parker Interests (In re Grimland, Inc.)*, 243 F.3d 228, 232 n.5 (5th Cir. 2001) (noting that *In re H.L.S. Energy* did not reach "the issue of whether post-petition expenses for remediation of pre-petition environmental liabilities are administrative expenses"); *In re H.L.S. Energy*, 151 F.3d at 439 ("Because the plugging requirement here accrued post-petition, we need not reach the question whether post-petition expenses for the remediation of pre-petition environmental liabilities would likewise constitute an administrative expense."). However, precedent from the Supreme Court and other circuit courts provide this Court with substantial guidance.

### A. Debtor's Obligation to Comply with State Law

A bankruptcy petition is not a grant of immunity.  Bankrupt debtors are no different from any citizen in that they must comply with state and federal laws.  Section 959(b) of Title 28 of the United States Code provides that a trustee or debtor-in-possession "shall mange and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b); *Midlantic Nat. Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494, 502, 106 S.Ct. 755 (1986) ("Congress has repeatedly expressed its legislative determination that the trustee is not to have *carte blanche* to ignore nonbankruptcy law."); *In re GMC Heartland Partners*, 966 F.2d 1143, 1146 (7th Cir. 1992) ("Having been a debtor in bankruptcy does not authorize a firm to operate a nuisance today, or otherwise excuse it from complying with laws of general application."). *See also N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 534, 104 S.Ct. 1188 (1984) (A "debtor-in-possession is not relieved of all obligations under the National Labor Relations Act simply by filing a petition for bankruptcy.").

Accordingly, a trustee cannot abandon contaminated estate property if state health or safety law prohibits such abandonment. *Midlantic*, 474 U.S. at 507 ("we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards"); *Ohio v. Kovacs*, 469 U.S. 274, 285, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985) ("Plainly, that person or firm [in possession of estate property] may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions.").

If the Trustee cannot abandon property or operate an estate in violation of an environmental law, then what is the nature of the trustee's duty to mitigate a continuing post-

petition environmental liability that has a pre-petition origin?  To properly analyze the treatment of the Commission's claim, we must examine the facts underlying the Supreme Court's *Midlantic* case.  All relevant circuit court opinions that have considered administrative expense characterization of environmental liabilities are rooted in *Midlantic's* holding.

### B. Midlantic

The debtor in *Midlantic* was Quanta Resources Corporation. *Midlantic*, 474 U.S. at 496. Quanta processed waste oil at a facility in Edgewater, New Jersey, pursuant to a permit issued by the New Jersey Department of Environmental Protection. *Id*. at 496–97.  In June of 1981, Quanta accepted more than 400,000 gallons of PCB-contaminated waste oil for processing. *Id*. at 497. This violated its New Jersey permit. *Id*.  Without remedying its violation, Quanta filed a chapter 11 bankruptcy petition on October 6, 1981. *Id*. On October 7, 1981, the State ordered Quanta to clean up its Edgewater site. *Id*. Unable to comply with its clean-up obligation, Quanta  converted its case to a case under chapter 7 of the Bankruptcy Code. *Id*.

After conversion to chapter 7, it was determined that Quanta had accepted over 70,000 gallons of PCB-contaminated waste at a separate, heavily-mortgaged site in Long Island City, New York. *Id.* The cleanup cost of the heavily-mortgaged Long Island site exceeded the site's value to the estate. *Id*. Accordingly, the chapter 7 trustee sought to abandon the site. *Id.*  The City and State of New York unsuccessfully objected to the abandonment. *Id*. at 498.  The Trustee subsequently sought to abandon the contaminated oil located at the Edgewater, New Jersey site. *Id*. The abandonment was approved over the objections of the State of New Jersey. *Id.* at 498–99.

During the appellate process, New York spent $2.5 million to clean up the Long Island City site. *Id*. at 498. New York sought to have its $2.5 million expenditure treated as an

administrative expense, but that issue was not presented to the Supreme Court. *Id.* at 498 n.2. Instead, the Supreme Court evaluated whether the site could be abandoned. *Id.*

The ultimate conclusion in *Midlantic* was that "the trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safetey from identified hazards." *Id*. at 507.

It is important to note that *Midlantic* was not decided based on the statutory language of the Bankruptcy Code.  As Justice Rehnquist explained in his dissent, the Court crafted a policy from historic antecedents. *Id*. at 507–08.  The history upon which *Midlantic* was crafted led the Court to adopt a policy that a bankruptcy trustee's powers were subservient to the state's health and safety concerns. *Id*. at 500–01.

Inasmuch as the *Midlantic* decision was based on policy rather than text, this Court must apply that policy to the facts before it.  What policy could be served by leaving an environmental hazard with an estate that was unable to clean the mess?  Inasmuch as the Debtor cannot abandon the property, how does one apply 28 U.S.C. § 959?  Without abandonment, § 959's teachings are clear—property in the trustee's possession must be managed in accordance with state law.  The fact that the debtor does not intend to operate the property does not diminish its duty under § 959 to manage the property in accordance with state law.

A debtor's obligation to expend funds to bring the estate into compliance with a state health and safety law is not contingent upon whether the obligation arose before or after the bankruptcy filing.  State law imposes a continuing duty to plug the wells at issue.  That continuing state-law-health-and-safety duty makes the plugging obligation a post-petition obligation that has pre-petition antecedents.  Accordingly, with respect to these environmental liabilities, whether the liability arose pre-petition or post-petition produces an analysis that is

superficial.  The analysis must focus not on just when the obligation arose, but whether the obligation continues to arise anew with the passage of each day.

Under § 959 and *Midlantic*, American Coastal's obligation to plug the wells in accordance with Texas law is a continuing post-petition obligation.  American Coastal's continuing post-petition duty to conform with Texas law renders expenditures necessary to conform with that law actual and necessary costs of preserving the estate entitled to § 503(b)(1)(a) administrative priority.

The Fifth Circuit's *H.L.S. Energy* holding relied upon *Midlantic*'s principle that debtors cannot operate an estate in violation of an environmental or safety law. *In re H.L.S. Energy*, 151 F.3d at 438. Other circuit courts have relied upon the same principle to hold that post-petition expenditures for pre-petition environmental liabilities are § 503(b)(1)(A) administrative expenses.

### C. Circuit Court Precedent

The Second, Third, and Sixth Circuits have all held that post-petition expenses incurred to redress pre-petition environmental liabilities are entitled to administrative expense priority.  In *Conroy*, an opinion authored by now Justice Alito, the debtor operated a printing business that produced hazardous waste. *Pa. Dep't of Envtl. Res. v. Conroy*, 24 F.3d 568, 569 (3d Cir. 1994). Pre-petition, the Pennsylvania Department of Environmental Resources found the debtor in violation of the Pennsylvania Hazardous Sites Cleanup Act. *Id*. Post-petition, the Department of Environmental Resources incurred over $100,000 to cleanup the debtor's hazardous waste. *Id*. In *Chateaugay Corp.*, a national steel, aerospace, and energy corporation incurred pre-petition environmental liabilities in all fifty states. *U.S. v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 999 (2d Cir. 1991). The EPA sought a declaratory judgment that future post-petition costs,

(estimated to be tens of millions of dollars), incurred to remedy pre-petition environmental liabilities were § 503(b)(1)(A) administrative expenses. *Id.* at 1001. In *Wall Tube & Metal Products Company*, the debtor produced hazardous waste through its manufacturing process. *Lancaster v. State of Tenn. (In re Wall Tube & Metal Prods. Co)*, 831 F.2d 118, 119 (6th Cir. 1987).  Pre-petition, the Tennessee Department of Health and Environment issued a citation for violation of the Tennessee Hazardous Waste Management Act. *Id.* at 120. Post-petition, the Tennessee Department inspected and analyzed the debtor's property, incurring approximately $24,000 in "response costs." *Id*. at 120–21.

In each of the above cases, the Circuit Courts held that the state environmental agencies' claims were administrative expenses.  The Courts relied on *Midlantic* for the proposition that neither a debtor nor trustee can manage a bankruptcy estate in contravention of a state environmental or safety law. *Conroy*, 24 F.3d at 569–70 (agreeing with the *In re Chateaugay Corp.* and *In re Wall Tube & Prods.* Courts' reasoning "that since the estate could not avoid such costs through abandonment, the 'expenses to remove the threat posed by such substances are necessary to preserve the estate.'") (quoting *Chateaugay*, 944 F.2d at 1010); *In re Chateaugay Corp.*, 944 F.2d at 1009–1010 (agreeing with the District Court's reasoning that "[i]f property on which toxic substances pose a significant hazard to public health cannot be abandoned, it must then follow . . . that expenses to remove the threat posed by such substances are necessary to preserve the estate"); *In re Wall Tube & Metal Prods. Co*., 831 F.3d at 121–22 ("It follows that if the Wall Tube trustee could not have abandoned the estate in contravention of the State's environmental law, neither then should he have *maintained or possessed* the estate in continuous violation of that same law.") (emphasis in original).  Accordingly, expenses incurred to comply with state or federal environmental or safety laws are actual and necessary costs of preserving

the estate. *Id*. No Court was troubled with the fact that the expenses arose from pre-petition liabilities.[4]

The District Court for the Northern District of Texas relied on the three circuit court opinions cited above to find that a post-petition expenditure for a pre-petition environmental liability qualified as a § 503(b)(1)(A) administrative expense. *In re Nat'l Gypsum Co.*, 139 B.R. 397, 413 (N.D. Tex. 1992) ("all response costs incurred post-petition as a result of conduct occurring pre-petition . . . are entitled to administrative priority . . .). The *Gypsum* Court limited its holding to where the "costs were necessitated by conditions that posed an imminent and identifiable harm to the environment and public health." *Id*.

This Court respectfully disagrees with the limitation placed by the *National Gypsum* Court. The Court reads the Supreme Court's *Midlantic* opinion to require the Court to determine whether the debtor is violating a statute "reasonably designed to protect the public health or safety from identified hazards," not the extent to which particular conduct imposes actual and imminent threats. *Midlantic*, 474 U.S. at 507 ("we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards"). This Court need not make a determination whether the environmental hazard presents an imminent or identifiable harm. It is enough that the Commission's claim arises from a state law designed to protect the public from an identified hazard. It is not the Court's prerogative to replace the legislature's judgment with its own judgment as to what conduct constitutes a sufficient threat to the public.

---

[4] Opinions that have denied administrative expense characterization of post-petition expenditures to remediate pre-petition environmental liabilities involved expenditures on property that was no longer property of the bankruptcy estate. *In re Dant & Russell, Inc.*, 853 F.2d 700, 709 (9th Cir. 1988) ("*Kovacs* and *Johnson Bronze* are significant in that they involved assertions of administrative expense priority by a lessor for cleanup costs resulting from property not owned by the bankruptcy estate"). *See also Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985); *Southern Ry. Co. v. Johnson Bronze Co.*, 758 F.2d 137, 141 (3d Cir. 1985). Since the property was no longer estate property, the expenditure was not necessary to preserve the estate.

The applicable provisions of the Texas Natural Resources Code are reasonably designed to protect the public health and safety.   In adopting the Texas Natural Resources Code, the legislature found as follows:

> The conservation and development of all the natural resources of this state are declared to be a public right and duty.   *It is also declared that the protection of water and land of the state against pollution or the escape of oil or gas is in the public interest.*   In the exercise of the police power of the state, it is necessary and desirable to provide additional means so that wells that are drilled for the exploration, development, or production of oil or gas, or as injection of salt water disposal wells, and that have been abandoned and are leaking salt water, oil, gas, or other deleterious substances into freshwater formations or on the surface of the land, may be plugged, replugged, or repaired by or under the authority and direction of the commission.

TEX NAT. RES. CODE ANN. § 89.001 (emphasis added).

The legislature determined, through passage of the Texas Natural Resources Code, that wells in the condition of American Coastal's wells should be plugged to protect the "water and land of the state against pollution or the escape of oil or gas."   The Commission found that American Coastal's wells violated the Natural Resources Code.   In another case, this Court might be called upon to determine whether such a finding was pre-textual, but that is not the case here.   *See Skinner v. Railway Labor Exec. Ass'n,* 489 U.S. 602, 621 n.5, 109 S.Ct. 1402 (1989). The Commission has made a health and safety finding, not challenged as to its bona fides by any party.

The Court also notes that the Supreme Court has left open the possibility that environmental liabilities may be so significant in relation to the debtor's ability to pay that characterizing all or a portion of an environmental claim as an administrative expense may unduly "interfere with the bankruptcy adjudication itself." *Midlantic*, 474 U.S. at 507. (noting that the Court was not "reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself").

American Coastal has not suggested that the Commission's claim is unduly onerous.  On the contrary, American Coastal's confirmed plan provides that American Coastal will pay 100% of the Commission's claim on the effective date of the plan if this Court determines that the claim is an administrative expense.  Like the Supreme Court in *Midlantic*, this is a question we do not address in this Memorandum Opinion.

### D. American Coastal's Arguments

American Coastal contends that the Commission's expenditures are not administrative expenses because only post-petition liabilities can qualify as § 503(b)(1)(A) administrative expenses and American Coastal's plugging liability arose pre-petition.  American Coastal cites Fifth Circuit language stating that § 503(b)(1)(A) administrative expenses must arise from post-petition obligations. *Lasky v. Phones For All, Inc. (In re Phones For All, Inc.)*, 288 F.3d 730, 732 (5th Cir. 2002) (holding that to qualify as a § 503(b)(1)(A) administrative expenses, the claim "'must have arisen from a transaction with the debtor in possession'") (quoting *In re Commercial Fin. Servs., Inc.*, 246 F.3d 1291, 1294 (10th Cir. 2001)); *In re Jack/Wade Drilling, Inc.*, 258 F.3d at 387 ("In order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefited the estate.") (citing *Toma Steel Supply, Inc. v. TransAmerican Natural Gas Corp. (In re Transamerican Natural Gas Corp.)*, 978 F.2d 1409, 1416 (5th  Cir. 1992)).

American Coastal's focus on the alleged "post-petition" liability requirement of a § 503(b)(1)(A) expense relies on Fifth Circuit language divorced from its context.  The cited language is largely derived from opinions based on the Fifth Circuit's *In re TransAmerican Natural Gas Corporation* opinion. *See In re Jack/Wade Drilling, Inc.*, 258 F.3d at 387 (citing *In re TransAmerican Natural Gas Corp.*, 258 F.3d at 387); *In re Am. Plumbing & Mech., Inc.*, 323

B.R. 442, 459 (Bankr. W.D. Tex. 2005) (citing *In re TransAamerican Natural Gas Corp.*, 258 F.3d at 387).

The *TransAmerican* opinion only held that a claimant *may* establish that its claim qualifies as an administrative expense under § 503(b)(1)(A) by demonstrating that the claim arose from a transaction with the debtor-in-possession. *In re TransAmerican Natural Gas Corp.*, 978 F.3d at 1416 ("A prima facie case under § 503(b)(1) *may* be established by evidence that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function as a going concern.") (emphasis added). Indeed, if the Fifth Circuit had held that § 503(b)(1)(A) only applies to post-petition liabilities, then the *H.L.S* and *Grimland* Courts would not have found it necessary to note that it remains an open issue as to whether a post-petition expenditure for a pre-petition environmental liability qualifies as an § 503(b)(1)(A) administrative expense. *In re Grimland, Inc.*, 243 F.3d at 232 n. 5; *In re H.L.S.*, 151 F.3d at 439.   In any event, because the Fifth Circuit case law referenced by American Coastal does not include consideration of the special environmental issues addressed by *Midlantic*, the cases are largely inapposite.

Section 503(b)(1)(A)'s underlying purpose is to encourage post-petition conduct that will assist the debtor's efforts to rehabilitate the estate or organize the estate's assets in an orderly fashion to ensure an efficient sale. *In re TransAmerican Natural Gas Corp.*, 978 F.2d at 1415 ("[t]he purpose of Section 503 is to permit the debtor's business to operate for the benefit of its pre-petition creditors"); *Pa. Dep't of Envtl. Res. v. Tri-State Clinical Labs, Inc.*, 178 F.3d 685, 689–90 (3d Cir. 1999) ("Thus, the language of § 503(b) read as a whole, suggests a quid pro quo pursuant to which the estate accrues a debt in exchange for some consideration necessary to the operation or rehabilitation of the estate."); *In re Jartan, Inc.* 732 F.2d 584, 588 (7th Cir. 1984)

("Thus, administrative priority is granted to post-petition expenses so that third parties will be moved to provide the goods and services necessary for a successful reorganization."). *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976) ("Congress recognized that, if a business is to be reorganized, third parties must be willing to provide the necessary goods and services.  Since they clearly will not do so unless their claims for payment will be paid ahead of the pre-petition debts . . . [the Code] provides a priority for expenses incurred by the debtor-in-possession in order to maintain, preserve, or rehabilitate the bankruptcy estate.").

In most instances, only expenditures on post-petition liabilities will be necessary to preserve the estate.  Most pre-petition liabilities are of the type the Bankruptcy Code was designed to reorganize through a plan rather than liabilities an estate must incur to rehabilitate or organize the debtor's affairs.  With respect to most pre-petition liabilities, the third-party has already provided the goods or services to the debtor so that no inducement through awarding administrative priority is necessary. *See In re Jartan, Inc.*, 732 F.2d at 588 ("In the case before us, no inducement by the debtor-in-possession was required because the liability for the costs of the ads was irrevocably incurred before the petition was filed."). The provider must await its pro-rata distribution provided by the plan like all other unsecured creditors.  Payment on the goods outside a plan is not necessary to preserve the estate and certainly does not benefit the estate since the debtor may be able to confirm a plan that provides for payment of only a small percentage of the debt.

The cases cited by American Coastal demonstrate that, in most instances, expenditures on pre-petition liabilities are not necessary to preserve the estate.  None of the cases denied administrative expense characterization of the claim at issue solely because the claim had its

genesis in a pre-petition liability.  Rather, in each case, the courts focused on the fact that the expense did not benefit the estate. *In re Phones For All, Inc.*, 288 F.3d at 732 (creditor's "claim did not represent services that conferred a benefit on the estate as required to garner administrative priority status"); *In re Jack/Wade Drilling, Inc.*, 258 F.3d at 387 ("TMC admits that its claim against Jack/Wade does not meet the requirements for section 503(b)(1)(A) treatment because the debtor's estate received no discernable benefit from the lawsuit against TMC."); *In re Am. Plumbing & Mech., Inc.*, 323 B.R. at 460–61 (noting that the bonuses at issue did not benefit the estate because the employees seeking administrative characterization of the bonuses left the debtor's business shortly after the bankruptcy filing and before the bonuses were triggered).  Unlike the expenses considered in the cited cases, the Commission's expense clearly benefited American Coastal's estate by expending funds that fulfilled American Coastal's continuing plugging obligations and precluded the accrual of monetary fines.[5]

Environmental claims arising from a pre-petition liability do not fit within the same framework as trade-creditor claims arising from pre-petition liabilities.  Because the debtor-in-possession is required to operate the estate in accordance with state law, post-petition expenditures necessary to bring the estate into compliance with the law are necessary for the

---

[5] During the November 20, 2008 hearing, American Coastal's President testified that American Coastal intended to avoid the plugging expenses by selling its interests in the wells to a third-party who would develop the wells.  If plugging could be avoided by developing the inactive wells into producing wells, then, assumingly, the plugging expenditures were not actual and necessary costs of preserving the estate.  American Coastal was ultimately able to sell its interests in the remaining wells.  Gulf Energy, the new operator of the wells did obtain an order setting aside a Final Order requiring plugging with respect to two of the wells.  Nevertheless, the Commission's March 11 Order noted that seven of American Coastal's eight wells had been inactive for over 11 years.  The Order noted American Coastal's prior unsuccessful attempts to find a purchaser willing to plug the wells.  The Order also noted American Coastal's request for a delay of the plugging so that American Coastal could find an investor willing to purchase the wells and undertake the required plugging.  The Commission found "[t]here are reasons for zero confidence in this proposal" based on American Coastal's prior dealings with the Commission.  The Court gives substantial weight to the March 11 Order.  There is no evidence that Gulf Energy would have been able to set aside the plugging orders with respect to the plugged wells.  Moreover, the fact that Gulf Energy participated in the settlement with the Commission that lead to the plugging expenditures at issue suggests that the most promising wells were those that the Commission agreed to delay plugging.  On balance, there is insufficient evidence to determine that the plugging expenditures could have been avoided by redevelopment or plugging by a third-party.

debtor's rehabilitation.  The need to bring the estate into compliance with state environmental and safety laws is no less significant than the need to maintain commercial relations with trade-creditors that provide the raw materials of the debtor's business.  A debtor cannot operate an estate in violation of environmental and safety laws.

Accordingly, the "post-petition" language from court opinions, like the "benefit" language, can be read as "simply a gloss on the underlying concept of what is 'necessary.'" *In re H.L.S. Energy*, 151 F.3d at 438.  The "post-petition" language, like the "benefit" requirement, "has no independent basis in the Code" and therefore is best treated as a "way of testing whether a particular expense was truly 'necessary'" rather than an independent element of § 503(b)(1)(A). *Id.* at 437.  As explained above, expenditures for remedying violations of environmental and safety laws are necessary to preserve the estate, regardless of whether liability for the state law violation first occurred before or after the filing of a bankruptcy petition.

### Conclusion

The Commission's plugging cost is an administrative expense under § 503(b)(1)(A).

Signed at Houston, Texas, on January 15, 2009.

MARVIN ISGUR
United States Bankruptcy Judge